UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| RANDELL WRIGHT, | Case No. 17-cv-01476-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION AND DENYING DEFENDANT'S CROSS-MOTION** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF Nos. 28, 29 |

## INTRODUCTION

Plaintiff Randell Wright seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] He moved for summary judgment;[2] the Commissioner opposed the motion and filed a cross-motion.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge

---

[1] Compl. – ECF No. 1 at 1. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Summary-Judgment Motion – ECF No. 28.

[3] Cross-Motion – ECF No. 29.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

# STATEMENT

## 1. Procedural History

On April 11, 2012, Mr. Wright, then age 50, filed claims for Social- Security disability insurance ("SSDI") benefits under Title II of the Social Security Act and supplemental security income ("SSI") benefits under Title XVI, alleging degenerative-disc disease, pinched nerves, sciatica, and a back injury[5] and submitting medical records documenting his obesity and mental-health treatments.[6] He alleged an onset date of February 24, 2011 and met the insured status requirements through December 31, 2011.[7] The Commissioner denied his SSDI and SSI claims initially and on reconsideration.[8] On November 6, 2013, Mr. Wright timely requested a hearing.[9]

On May 29, 2015, Administrative Law Judge John Heyer (the "ALJ") held a hearing.[10] Attorney Eva Chan represented Mr. Wright.[11] The ALJ heard testimony from Mr. Wright and vocational expert Roxane Minkus.[12] The ALJ issued an unfavorable decision on August 5, 2015.[13] The Appeals Council denied Mr. Wright's request for review.[14] Mr. Wright timely filed this action

---

[4] Consent Forms – ECF Nos. 11, 15.

[5] Administrative Record ("AR") 228–29, 233. Mr. Wright's date of birth is October 22, 1961. AR 228.

[6] AR 4.

[7] AR 14, 228.

[8] AR 85 (determinations on SSI claim); AR 84 (determinations on SSDI claim); AR 138–39 (request for reconsideration); AR 119 (reconsideration determinations on SSDI claim); AR 118 (reconsideration determination on SSI claim).

[9] AR 158–59.

[10] AR 29–54.

[11] AR 29.

[12] *Id.*

[13] AR 9–28.

[14] AR 1–3.

on March 18, 2017 and moved for summary judgment.[15] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[16]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 John D. Warbritton II, M.D. — Examining

On January 11, 2012, Mr. Wright saw Dr. Warbritton (an orthopedist) as part of an evaluation for a workers-compensation claim related to injuries he sustained in a motor-vehicle accident.[17] Mr. Wright complained of a constant sharp, stabbing, shooting pain in his neck, lower back, and right shoulder.[18] He was not taking any medications at the time.[19] Dr. Warbritton reviewed Mr. Wright's medical records and performed a physical examination.[20] Mr. Wright was 6' 1.5" tall, weighed over 300 pounds, and needed to use a cane.[21] Dr. Warbritton noted limited movement in Mr. Wright's neck, lateral bending, true-lumbar spine-flexation angle, extension from the neural position, and lateral bending.[22] Movement in his neck and back was associated with slight to moderate pain.[23] His neck had a "slight to moderate cervical paraspinal muscle spasm," and his lower back had a "moderate lumbar paraspinal muscle spasm."[24] Dr. Warbritton diagnosed Mr. Wright with the following: (1) lumbar strain, moderate, chronic; (2) degenerative-disc disease, lumbar spine, slight to moderate; (3) bilateral L5 and S1 radiculopathies; (4) cervical strain, slight

---

[15] Compl. – ECF No. 1; Summary-Judgment Motion – ECF No. 28.

[16] Cross-Motion – ECF No. 29.

[17] AR 412.

[18] AR 414.

[19] AR 415.

[20] AR 419–422.

[21] AR 419.

[22] AR 419–420.

[23] *Id.*

[24] AR 420.

to moderate, chronic; (5) cervical spondylosis, slight; (6) right C6 and C7 radiculopathies; and (7) myofascial-pain syndrome.[25]

In the impairment assessment, Dr. Warbritton concluded that Mr. Wright "demonstrates impairment referable to the cervical spine that most clearly responds to a DRE Cervical Category II, contemplating a fifteen to eighteen percent impairment of the whole person."[26] He "experiences a <u>substantial</u> compromise with regard to his ability to perform a wide range of activities of daily living or work activities, as confirmed based upon the completion of a two page 'Questions Concerning Activities of Daily Living' form in my office."[27] Nonetheless, Dr. Warbritton provided Mr. Wright with a "work release" because he "strongly desires to attempt to return to his usual and customary job duties."[28] He recommended strengthening and stretching exercises, visits with a personal trainer or physical therapist, and ongoing use of multiple medications, including anti-inflammatory agents, muscle relaxants, and narcotic analgesics.[29]

### 2.1.2 Albert V. Retodo, M.D. — Examining

Following a referral from Dr. Warbritton, on January 11, 2012, Mr. Wright saw Dr. Retodo (who is board certified in physical medicine, rehabilitation and neuromuscular and electrodiagnostic medicine) for his severe neck and back pain.[30] Dr. Retodo performed motor-nerve, sensory-nerve, F-Wave, and EMG studies.[31] He concluded that these studies were "abnormal."[32]

United States District Court
Northern District of California

---

[25] AR 421.

[26] AR 422.

[27] *Id.* (emphasis in original).

[28] AR 425.

[29] AR 426–27.

[30] AR 403.

[31] AR 403–05.

[32] AR 406.

### 2.1.3 South of Market Health Center — Treating

Mr. Wright attended appointments at South of Market Health Center from April 29, 2009 to September 19, 2012.[33] The progress notes documented that he weighed 331 pounds on February 25, 2011 and 365 pounds on October 3, 2012.[34] The progress note from October 3, 2012 stated that Mr. Wright was going through "mental difficulties."[35] The progress notes included regular physical assessments, such as blood pressure readings, and notes about lab tests.[36] He received medication refills, although the notes are difficult to read and do not clearly show the medications prescribed.[37]

### 2.1.4 San Francisco General Hospital 2012 — Treating

On November 5, 2012, Mr. Wright was admitted to San Francisco General Hospital Psychiatric Emergency Services department after he used crack cocaine in a purported suicide attempt.[38] He stated to the admitting nurse that he had been clean and sober for 10 years before this relapse.[39] He stated that he "fell off the wagon": drank alcohol, smoked marijuana, and then "decided to end it all by heart attack" and smoked crack cocaine.[40] He was "depressed and angry" and had been "depressed for several months."[41] He had never attempted suicide before.[42] He stated he had AH [auditory hallucinations] occasionally, but usually was not bothered by the voices.[43] The nurse noted: "Believes they are unreal; Stated voice content doesn't bother him; sometimes

---

[33] AR 437–475.

[34] AR 438, 442.

[35] AR 438.

[36] AR 437–475.

[37] AR 447.

[38] AR 524.

[39] AR 527.

[40] AR 524.

[41] AR 524–25.

[42] AR 524.

[43] *Id.*

has long conversations with the voices."[44] He reported experiencing chronic lower-back and neck pain.[45] He reported that he was prescribed and was taking Vicodin.[46]

Eric Bender, M.D. examined Mr. Wright and diagnosed him with the following: a mood disorder; cocaine, alcohol, and cannabis abuse; a personality disorder not otherwise specified ("NOS"); obesity; hypertension; lower-extremity edema; chest pain; and chronic back pain.[47] He assigned Mr. Wright a Global Assessment of Functioning ("GAF") score of 38.[48] Sebastien Fromont, M.D. completed a Physician Summary that included the same diagnoses and GAF score.[49]

### 2.1.5 Douglas Peter-Frank, PhD — Treating

Dr. Peter-Frank completed a psychiatric evaluation of Mr. Wright on November 29, 2012.[50] He noted that Mr. Wright "had an uncomfortable looking posture while sitting" but "ambulated without assistance."[51] He found that Mr. Wright "to be a reliable historian."[52] Mr. Wright stated that he "had been depressed somewhat before" his car accident and "has been much more depressed since that time since he has been unable to work" and [was] going through a divorce.[53] He stated that "in the last six months, he has been hearing voices telling him to hurt himself and people talking about him and wanting to get him."[54] He stated that he had been "outgoing and

---

[44] AR 525.

[45] AR 527.

[46] AR 528.

[47] *Id.*

[48] *Id.* A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin,* 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'").

[49] AR 529.

[50] AR 532.

[51] *Id.*

[52] *Id.*

[53] AR 532–33.

[54] AR 533.

carefree and more recently has become an introvert and increasingly angry."[55] He had trouble sleeping and a loss of appetite.[56] He reported that he had attempted suicide by taking crack cocaine four weeks ago and that he had intentionally hurt himself by cutting his wrists five months ago.[57] He participated in outpatient therapy at SF General since the crack-cocaine overdose.[58] He reported that he was clean and sober for ten years before attempting suicide using crack cocaine.[59] He stated he could not clean or do yard work.[60] He could not stand for long enough to cook.[61] He needed help dressing because he could not put on his socks and shoes.[62] He was able to manage funds on his own.[63] He enjoyed playing chess, pool, and dominos and going to the ocean "to feel better."[64]

He had "limited" memory and insight, a "moderate" fund of knowledge and information, and "good" calculations, concentration, abstract thinking, and judgment.[65] As to effort, persistence, and pace, he "put forth good effort during the mental status exam," "was moderately persistent and worked at a variable pace, sometimes moderate, sometimes slow," and "did not correct his errors."[66]

---

[55] Id.

[56] Id.

[57] Id.

[58] Id.

[59] AR 534.

[60] Id.

[61] Id.

[62] Id.

[63] Id.

[64] Id.

[65] AR 535–36.

[66] AR 536.

Dr. Peter-Frank diagnosed Mr. Wright with "major depressive disorder with psychotic features" and "cocaine dependence in remission."[67] He assigned Mr. Wright a GAF score of 55.[68] Dr. Peter-Frank provided the following prognosis:

> Mr. Wright's mental health condition appears to have stemmed from his accident in 2011 or to be exacerbated by his medical condition and unemployment that followed his accident. His condition may abate on its own within a one year period though he would likely benefit from continuing mental health treatment and possibly starting medications. His overall prognosis is fair.[69]

He concluded that Mr. Wright was "unimpaired" with respect to his ability to perform simple and repetitive tasks, perform detailed and complex tasks, accept instructions from supervisors, interact with co-workers and the public, perform work activities on a consistent basis without special or additional instructions, and deal with the usual stress encountered in the workplace.[70] With respect to his ability to maintain regular attendance in the workplace and complete a normal workday and workweek without interruptions of a psychotic condition, Dr. Peter-Frank concluded that Mr. Wright was "mildly impaired due to the episodic nature of depression."[71]

### 2.1.6    Sunset Mental Health Center — Treating

Mr. Wright received care at Sunset Mental Health Center from November 2012 to February 2013.[72] Yim Chan, M.D. first assessed on November 19, 2012.[73] The assessment of Mr. Wright's "History of Present Illness" states:

> 51 [year old] divorced [African American] male with no prior psychiatric history
> …. [Patient] states that he is feeling depressed and anxious since he started using crack cocaine one month ago. He reports celebrating the Giants win and start to drink alcohol mixed with marijuana and then crack cocaine. [Patient] reports that he is undergoing a divorce after a marriage of two years. He reports problems with

---

[67] *Id.*

[68] *Id.*

[69] AR 536–37.

[70] AR 537.

[71] *Id.*

[72] AR 539, 887.

[73] AR 539.

sleep but his appetite is good. He denies any other symptoms for now and reports no use of substance for past month.[74]

The assessment states that he "now presents with depression and physical disability" and that he consented "for trial of antidepressants."[75] Dr. Chan diagnosed him with Major Depressive Disorder Single Episode Moderate.[76] Dr. Chan assigned Mr. Wright a Current GAF rating of 55 ("moderate symptoms or difficulty in functioning"), a Highest Level Last 12 Months GAF rating of 61 ("mild symptoms or difficulty in functioning"), and a Lowest Level Last 12 Months GAF rating of 51 ("moderate symptoms or difficulty in functioning").[77] He prescribed Mr. Wright 20 mg of Celexa per evening and planned to follow up in one month to evaluate Mr. Wright's response to the medication.[78]

Mr. Wright saw Raul Reyes, R.N. from November 30, 2012 to February 12, 2013. During his intake evaluation, Nurse Reyes noted that Mr. Wright presented with depression.[79] Mr. Wright was staying in an emergency hotel bed, was destitute, and was trying to find a source of income.[80] He "reported being unable to work because of knee and back pain due to [a motor vehicle accident] sustained in 2011."[81] Nurse Reyes diagnosed him with "depressive disorder."[82] Mr. Wright saw Nurse Reyes for follow-up appointments. He denied suicidal ideation or substance abuse.[83] He was "using a cane."[84] Nurse Reyes noted that he "remains depressed . . . ."[85] On

---

[74] *Id.*

[75] AR 542.

[76] AR 555.

[77] AR 555.

[78] AR 542, 557.

[79] AR 543.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] AR 550.

[85] AR 544.

January 8, 2013, Mr. Wright missed an appointment with Nurse Reyes.[86] On February 12, 2013, Nurse Reyes completed a discharge diagnosis and diagnosed Mr. Wright with "major depressive disorder single episode moderate."[87] Nurse Reyes's progress notes also documented that Mr. Wright was homeless and lived at temporary hotels and shelters, and the notes discussed Mr. Wright's attempts to stabilize his housing situation.[88]

### 2.1.7    Ritter Health Center — Treating

Ritter Health Center treated Mr. Wright from February 6, 2013 to June 25, 2013. During his first visit on February 6, 2013 with Cia Byrnes, Nurse Practitioner ("N.P.") he reported that he was following up because he had been told at the South of Market Clinic that he was hypertensive and pre-diabetic.[89] He wanted to lose weight and return to work as a driver.[90] He weighed 340 pounds and had a Body Mass Index ("BMI") of 45.06.[91] He reported chronic back pain.[92] He was not prescribed any additional medications.[93] He saw N.P. Byrnes for follow-up appointments. He continued to have "excessive back pain."[94] She prescribed 250 mg of Soma four times daily.[95]

On June 19, 2013, he saw Carmen Carrouche, R.N. for an initial evaluation of schizophrenia and/or bipolar disorder.[96] He complained of depression and chronic pain and said that he heard voices.[97] Nurse Carrouche noted that Mr. Wright "has a currently undetermined bipolar type and

---

[86] AR 553.

[87] AR 887.

[88] AR 546–552.

[89] AR 585.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] AR 581.

[95] AR 582.

[96] AR 567.

[97] *Id.*

[h]as three to four swings from mania to depression in a course of a year.[98] She prescribed

Bupropion HCI and Ziprasidone.[99] On June 25, 2013, Mr. Wright saw Nurse Carrouche for a

drop-in visit and complained of side effects from his medications, including increased voices,

agitations, and irritability.[100] She took him off bupropion but continued him on 20 mg of

Ziprasidone.[101] She advised him to come in again if his agitation continued.[102]

### 2.1.8 Dr. Zheutlin, Dr. Brode, Dr. Pham, & Dr. Pereyra — Consulting

A disability-determination-explanation report for Mr. Wright's SSDI included the physical and

mental assessments of various state agency consultants who reviewed Mr. Wright's medical

records.[103] On November 14, 2012, J. Zheutlin, M.D. found that Mr. Wright was capable of

performing "medium" "unskilled" work.[104] On January 16, 2013, Tawnya Brode, PsyD found that

Mr. Wright had "moderate" restrictions of daily living, difficulties in maintaining social

functioning, and difficulties in maintaining concentration, persistence, or pace.[105] Her notes state

that she "agree[d] that simple tasks [are] more appropriate" and she "recommend[ed] some social

considerations based on [claimant's] [history] and current social concerns."[106]

The disability-determination-explanation report for Mr. Wright's SSI application also included

state-agency-consultant assessments.[107] It included Dr. Zheutlin's November 14, 2012 report and

an additional residual-functional-capacity ("RFC") assessment that stated that Mr. Wright had the

following limitations: occasionally lift and/or carry 50 pounds, frequently lift/and or carry 25

pounds, stand and/or walk about 6 hours, sit for about 6 hours, push and/or pull unlimited (other

---

[98] *Id.*

[99] AR 568.

[100] AR 564.

[101] AR 565.

[102] AR 565.

[103] AR 55–67.

[104] AR 66.

[105] AR 63.

[106] AR 64.

[107] AR 68–83.

United States District Court
Northern District of California

than limits for lift and carry), frequently climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, balance frequently, stoop frequently, kneel frequently, crouch frequently, and crawl frequently.[108] The report also contained Dr. Brode's January 16, 2013 finding that Mr. Wright had "moderate" restrictions of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.[109] It included additional assessments from Dr. Brode that Mr. Wright was "able to understand and remember simple routines and instructions," had "sustained concentration and persistence limitations," was "able to maintain/sustain a workday/workweek schedule in a low demand setting," was "able to be supervised, able to interact with coworkers, and able to handle public contact in a superficial manner," was "able to adapt to typical stress and simple changes," and was not significantly limited in his ability to "carry out very short and simple instructions," "sustain an ordinary routine without special supervision," or "make simple work-related decisions."[110]

The disability-determination-explanation report on reconsideration of Mr. Wright's SSDI claim also included state-agency-consultant physical-and-mental assessments.[111] On August 30, 2013, H. Pham, M.D. adjusted Mr. Wright's physical limitations as follows: occasionally lift and/or carry 20 pounds; frequently lift/and or carry 10 pounds; occasionally climb ramps/stairs; never climb ladders/ropes/scaffold; and "environmental limitations."[112] On September 11, 2013, Rosalia Pereyra, PsyD reviewed Mr. Wright's mental-health treatment and concluded: "Prior assessment is affirmed as written."[113]

The disability-determination-explanation report for Mr. Wright's SSI claim on reconsideration also includes state-agency-consultant assessments.[114] On September 11, 2013, Dr. Pereyra

---

[108] AR 78–79.

[109] AR 76.

[110] AR 79–80.

[111] AR 86–100.

[112] AR 96–98.

[113] AR 93.

[114] AR 101–117.

completed an RFC assessment and concluded that Mr. Wright was capable of performing "semi-skilled" "light" work.[115] She found, however, that Mr. Wright had only "mild" restrictions in activities of daily living and maintaining social functioning and had difficulties in maintaining concentration, persistence, or pace.[116]

### 2.1.9    San Francisco General Hospital 2013 — Treating

Mr. Wright was admitted to the San Francisco General Hospital Psychiatric Emergency Services department for a second time on August 2, 2013 after he tried to commit suicide by overdosing on over-the-counter sleeping medications.[117] After the hospital admitted Mr. Wright, Pamela Swedlow, M.D. evaluated him. He reported that he tried to kill himself after his car was impounded.[118] He had been living in his car and was using his car to make money by giving people rides.[119] Dr. Swedlow diagnosed him with a Mood Disorder, Cocaine Abuse, Alcohol Abuse, Cannabis Abuse, and obesity.[120]

Sharon Morrow, R.N. also evaluated Mr. Wright and diagnosed him with Bipolar Disorder I, Most Recent Episode Depressed, With Psychotic Features, and obesity.[121] Her assessment noted several anxiety symptoms: "excessive uncontrolled worry, [a]pprehension, restlessness, sleep disturbance, [i]nterpersonal anxiety." [122]

Attending resident Jessica Ross, M.D. completed a Psychiatry Attending/Resident Progress note, a mental-status exam, and a discharge evaluation.[123] Mr. Wright denied any paranoia or delusions.[124] Dr. Ross diagnosed him with Psychosis NOS and depression with suicidal

---

[115] AR 116–117.

[116] AR 110.

[117] AR 619–21, 677.

[118] AR 622.

[119] *Id.*

[120] AR 620.

[121] AR 625.

[122] AR 623.

[123] AR 631, 673.

[124] AR 632–635.

ideation.[125] Dr. Ross prescribed Abilify for auditory hallucinations and depression, Celexa for depression, Trazadone for sleep, and Vicodin for pain.[126] His Abilify prescription was increased to 30 mg daily for "psychotic symptoms including command auditory hallucinations."[127] He gradually improved with respect to suicidal ideation and mood and reported a reduction in auditory hallucinations with Abilify.[128] The hospital discharged Mr. Wright on August 9, 2013.[129]

### 2.1.10   La Posada Crisis Residential Program — Treating

Mr. Wright received care from August 9, 2013 to August 27, 2013 at the La Posada Crisis Residential Program.[130] Jessica Martinez (occupation and degree not specified) completed a clinical assessment.[131] Her notes stated that Mr. Wright arrived at the residential-treatment program "from unit 7A at San Francisco General Hospital."[132] When he arrived, he disclosed only that "I fucked up, tried to kill myself, it didn't work."[133] The assessment notes also stated that Mr. Wright "hears voices which tell him to 'get out of here' and that he is not worthy."[134] Ms. Martinez assigned Mr. Wright a GAF score of 35.[135]

While in the program, Mr. Wright worked on developing a living-arrangement and treatment plan.[136] The closing summary stated: "Staff explored client feelings of self-worth and productivity to reduce symptoms of depression, including feelings of hopelessness, derogatory and command auditory hallucinations, and self-destructive behaviors that impair client's motivation to seek and

---

[125] AR 632.

[126] *Id.*

[127] AR 672.

[128] AR 672–73.

[129] AR 671 (Psychiatric Transfer Summary: Admission date 8/3/2013; Discharge date 8/9/2013).

[130] AR 599–614

[131] AR 601–604.

[132] AR 601.

[133] *Id.*

[134] *Id.*

[135] AR 603.

[136] AR 607–612.

maintain stable living arrangements."[137] La Posada discharged him on August 27, 2013, with a

plan to stay at the Salvation Army Shelter and with a 3-day supply of "psychotropic"

medications.[138]

### 2.1.11   Mission Mental Health — Treating

Mr. Wright received care at Mission Mental Health from December 2013 to February 2016.

Mr. Wright saw Israel Katz, M.D. (a psychiatrist) for mental-health treatment. Dr. Katz completed

a psychiatric evaluation on February 19, 2014.[139] Mr. Wright reported a history of depressive and

psychotic symptoms since age seven and auditory hallucinations since childhood.[140] He reported

that he had not had auditory hallucinations for several weeks.[141] Dr. Katz diagnosed Mr. Wright

with "Schizoaffective Disorder, Depressed Type; Alcohol and Cocaine Dependence in Remission

for 8 Months, In Controlled Environment; Hx Spine Fracture; Hx Arthritis of Back, Hands, Knees;

Financial and Social Stressors."[142] Dr. Katz noted that Mr. Wright "did not seem to meet [the]

criteria for psychopathic personality disorder."[143] He saw him again on March 5, 2014, and Mr.

Wright reported "ongoing [auditory hallucinations] that at times tell him he is useless and

worthless."[144] On March 17, 2014, he denied feeling tired or sedated but stated that he "continues

to hear voices."[145] On April 7, 2014, he reported that he felt "a bit less depressed, and that he has

been hearing voices less often."[146] On May 5, 2015, he had been out of medication for one to two

weeks and reported "ongoing depression and [auditory hallucinations] but states that these have

---

[137] AR 599.

[138] *Id.*

[139] AR 850–51.

[140] AR 850.

[141] *Id.*

[142] AR 851.

[143] *Id.*

[144] AR 854.

[145] AR 856.

[146] AR 859.

United States District Court
Northern District of California

decreased."[147] He missed several appointments.[148] On August 4, 2014, Dr. Katz called Mr. Wright, and Mr. Wright said it was difficult for him to make his appointments due to headaches and pain.[149] Dr. Katz called Mr. Wright on February 23, 2015, and Mr. Wright stated that he still had auditory hallucinations.[150] Dr. Katz told him that he needed to show up if he wanted to continue to be prescribed medications.[151] Mr. Wright saw Dr. Katz for several more appointments through September 2015.[152] His last appointment with Dr. Katz was on September 2, 2015. Mr. Wright reported that he had gone off his medication because he "felt overmedicated."[153] He reported increased depression and having auditory hallucinations for four to five days telling him to kill himself.[154] Dr. Katz restarted him on Wellbutrin XL, Risperdal, and Hydroxyzine.[155]

Mr. Wright saw Jennifer Landivar, a licensed clinical-social worker at Mission Mental Health from 2013 to 2016. She diagnosed him with Depressive Disorder Not Elsewhere Classified, Observation for Other Suspected Mental Condition, Other Unspecified Nonorganic Psychosis, Cocaine Abuse Unspecified, and Alcohol Abuse Unspecified.[156] She helped him with housing support, scheduling appointments, and getting medications refilled.[157] She also documented his mental-health status.[158] In December 2015, he told Ms. Landivar that he did not want to meet with

---

[147] AR 860.

[148] AR 876, 881, 884.

[149] AR 868.

[150] Id.

[151] Id.

[152] AR 1142.

[153] Id.

[154] Id.

[155] Id.

[156] AR 845.

[157] AR 1130, 1132–1137, 1140.

[158] Id.

Dr. Katz again because he "does not trust him," and in February 2016, he again stated that he "doesn't want to see [Dr. Katz] anymore."[159]

### 2.1.12 UCSF Medical Center — Treating

Mr. Wright saw several practitioners at UCSF Medical Center for regular appointments from July 2014 through March 2016.[160] He saw Amy Chen, M.D. as a primary-care physician for his first appointment on July 22, 2014.[161] He saw her primarily for back and knee pain.[162] She noted a diagnosis of depression.[163] She discussed surgical and non-surgical treatment options for back and knee pain, referred him to orthopedic surgery, and told him to begin physical therapy because he had not tried it previously.[164] She noted that his severe knee pain was likely exacerbated by his weight.[165] She saw him for multiple follow-up appointments.[166] At an appointment in January 2015, she noted that "if knees still hurt then he's going to get knee replacement."[167] In January 2015, she listed anxiety as an active problem and noted "Psychiatrist is prescribing psych meds, advised to follow up with him and pt amenable to doing this."[168]

Mr. Wright saw Sandra Kamholz Oza, M.D. at UCSF Medical Center on July 24, 2014 and had follow-up appointments with her.[169] She diagnosed him with depression and treated him for knee and back pain and trouble with sleeping.[170]

---

[159] AR 1151.

[160] AR 719.

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] AR 717, 722.

[165] AR 718.

[166] AR 752, 823.

[167] AR 824.

[168] AR 827.

[169] AR 715, 719.

[170] AR 717–18.

Mr. Wright saw David A. Besio, Registered Dietician ("R.D.") for his obesity and weight management.[171] He suggested changes that Mr. Wright could make to his diet and suggested walking for exercise and continuing physical therapy.[172] Mr. Wright saw R.D. Besio for follow-up appointments to monitor his diet and weight.[173]

Mr. Wright began physical therapy on August 13, 2014 and attended multiple physical-therapy sessions from August 2014 to January 2015.[174] He canceled an appointment in March 2015 "secondary to reports of extreme pain."[175]

He received steroid injections for his knees and back in 2014 and 2015.[176]

He saw Ana M. Padula, M.D. in December 2014 and January 2015 for worsening knee pain.[177] She noted that he had had injections for knee pain and was awaiting more injections.[178]

He saw Aparajita Singh, M.D. for a new consultation for obesity on April 6, 2015.[179] He was considering a surgical evaluation for gastric-bypass surgery.[180] He weighed 353 pounds and had a 45.94 BMI.[181] Dr. Singh noted that he had a history of obesity.[182] Dr. Singh's progress notes listed an anxiety diagnosis in Mr. Wright's past medical history.[183]

Mr. Wright was referred to Andrew Posselt, M.D. at UCSF Bariatric Surgery Center.[184] He saw Dr. Posselt on April 14, 2015, and Dr. Posselt noted that he had "morbid obesity and obesity-

---

[171] AR 908.

[172] AR 739–40, 780–81.

[173] AR 908.

[174] AR 727, 732, 738, 740, 750, 761, 766.

[175] AR 918.

[176] AR 807, 808, 812, 822, 903.

[177] AR 813.

[178] AR 814.

[179] AR 937.

[180] *Id.*

[181] AR 939.

[182] AR 937.

[183] *Id.*

[184] AR 945.

related comorbidities," including diabetes, osteoarthritis (painful joints), and depression.[185] He weighed 358 pounds and had a BMI of 46.59.[186] Dr. Posselt concluded that he satisfied the criteria for bariatric surgery.[187] Dr. Posselt's notes listed an anxiety diagnosis in Mr. Wright's past medical history.[188]

Mr. Wright began seeing Cindy Lai, M.D. in April 2015 as a transfer case from Dr. Chen for assistance completing the steps to undergo bariatric surgery.[189] Her notes stated that he was seen recently by "ortho spine who evaluated his films which are consistent with degenerative disease."[190] He reported that his "pain is stable and he is happy with his current regimen."[191] Dr. Lai noted that Mr. Wright's "Depression/schizophrenia" was managed by Dr. Katz at Mission Mental Health and that Mr. Wright "is stable, but states that he is depressed. . . ."[192] Mr. Wright stated that "it is difficult that he is unable to work due to his medical problems."[193]

Mr. Wright saw Gregory Summerville, M.D. from September to October 2015.[194] Dr. Summerville's treatment notes stated that Mr. Wright presented with schizophrenia and back pain.[195] His notes stated that he was "[s]till having many positive symptoms of schizophrenia with auditory hallucinations" and "[s]ome symptoms of depression, lack of pleasure."[196] Mr. Wright reported that he had not taken his medication for depression and schizophrenia for the last two

---

[185] AR 941–42.

[186] AR 945.

[187] Id.

[188] AR 942.

[189] AR 949. Bariatric surgery is a surgery performed on the stomach to induce weight loss.

[190] AR 960.

[191] Id.

[192] Id.

[193] Id.

[194] AR 1011, 1021.

[195] AR 1002.

[196] AR 1021.

months because it made him "all messed up," clouded his judgment, and made him too sleepy.[197] Mr. Wright reported hearing clusters of voices telling him to kill himself.[198] Dr. Summerville called Mr. Wright's treating psychiatrist — Dr. Katz — and in a follow-up appointment noted that Dr. Katz had changed Mr. Wright's medication regimen.[199] Mr. Wright reported to Dr. Summerville, however, that on his new medication regimen, he did not have any change in symptoms, he continued to hear clusters of voices, and the voices were no longer telling him to kill himself.[200]

Dr. Summerville noted that Mr. Wright received spine injections "with 10% improvement in symptoms."[201] Mr. Wright's knee and back pain were still bothering him.[202] Mr. Wright had not yet obtained a walker, but a prescription for a walker was provided to him.[203] At a later appointment, Dr. Summerville noted, "[f]our wheel walker and cane" related to knee pain.[204]

Mr. Wright saw Arjun Sinha, M.D. from January 2016 to March 2016 for follow-up appointments and medication refills.[205] She noted that he was using a walker and that he was approved for an electric wheelchair.[206] She documented a diagnosis of depression/schizophrenia.[207] She noted in January 2016 that Mr. Wright stopped taking his medications, he did not like psychiatrist Dr. Katz, and he had not been able to get in touch with him.[208] Mr. Wright reported that his auditory hallucinations were "worse, they just chatter," he

---

[197] AR 987.

[198] AR 1002.

[199] AR 1002.

[200] Id.

[201] AR 1000.

[202] AR 1002.

[203] Id.

[204] Id.

[205] AR 1037, 1045, 1057.

[206] AR 1035, 1039.

[207] AR 1043.

[208] Id.

was having some visual hallucinations, and he was able to differentiate between hallucinations and reality.[209] Mr. Wright also reported that he was having more knee and back pain, despite going to pool therapy and losing weight.[210] Her last treatment note from March 1, 2016 stated that his depression/schizophrenia was "not well controlled" but that he had no signs of "disorganized thought, SI or HI."[211]

## 2.2 Other Opinion Records[212]

### 2.2.1 Ralph Ortiz, D.C. — Treating

On March 2, 2011, Mr. Wright saw Ralph Ortiz (a chiropractor) for pain and stiffness in his neck and back related to the motor-vehicle accident described above.[213] Mr. Ortiz performed x-rays on Mr. Wright and concluded that he sustained "a whiplash injury resulting in a sprain and strain of the cervical, thoracic and lumbosacral spine which was compounded with degenerative joint disease of the cervical spine."[214] He concluded that Mr. Wright had "intervertebral disc syndrome of the cervical spine."[215] Mr. Wright "experienced pain, spasms and stiffness to the cervical, thoracic and lumbar spine and surrounding soft tissue with decreased range of motion to these areas, as well as cervicocranial syndrome with headaches and occipital pain."[216] Mr. Wright had "pain with sitting, walking and standing."[217] Dr. Ortiz prescribed pain medication.[218] Dr. Ortiz

---

[209] *Id.*

[210] AR 1050.

[211] AR 1056.

[212] As discussed *infra*, in addition to the medical opinions of the "acceptable medical sources," the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). "Other sources" include nurse practitioners, chiropractors, physicians' assistants, therapists, teachers, social workers, spouses and other non-medical sources. 20 C.F.R. § 404.1513(d).

[213] AR 372.

[214] AR 373.

[215] *Id.*

[216] *Id.*

[217] AR 374.

[218] AR 372.

advised Mr. Wright to not work for one month.[219] Mr. Wright did not return for further evaluation because he did not want to run up a bill; nonetheless he was still in pain from the accident.[220]

### 2.2.2 Brian W. Crawford, D.C. — Treating

Mr. Wright saw Brain W. Crawford (a chiropractor) between June 6, 2011 and July 27, 2011.[221] Mr. Wright reported that he had "moderate to severe low back pain radiating into both legs with numbness and tingling, constant moderate to severe mid-back pain, constant moderate to severe upper back pain, constant moderate to severe neck pain radiating into both arms, and constant moderate bilateral knee pain with stiffness."[222] Dr. Crawford diagnosed Mr. Wright with "disc displacement w/o MYE [Myelopathy]," "cervicobrachial syndrome," "pain in thoracic spine," "lumbago," "inflammation of SI joint," and "subluxation of SI [sacroiliac] joint."[223] Mr. Crawford found Mr. Wright incapacitated from work due to "severe neck and back pain" from June 6, 2011 to July 12, 2011 and July 20, 2011 to August 3, 2011.[224] Mr. Crawford recommended a series of chiropractic treatments.[225] On August 2, 2011, Mr. Crawford issued a report stating that Mr. Wright was able to return to work with the following restrictions through September 16, 2011: may not lift/push/pull/carry more than 10 pounds at any time; may not engage in prolonged bending or stooping; may not engage in prolonged or repetitive climbing, kneeling, or squatting; may not climb ladders or work at heights; and may not sit more than 2 hours/minute without getting up.[226] He noted that the restrictions should be observed until September 16, 2011 and then be reevaluated.[227]

---

[219] AR 374.

[220] Id.

[221] AR 377.

[222] AR 384, 386.

[223] AR 384–85.

[224] AR 392, 394–95.

[225] AR 386.

[226] AR 391.

[227] Id.

### 2.3    Mr. Wright's Testimony

At the ALJ hearing, Mr. Wright testified that he last worked on December 13, 2010 as a driver.[228] He testified that he had not sought work since then because he had "been in too much pain . . . and depression."[229] He testified that he could not lift more than 5 pounds, or sit, stand, or walk for more than ten minutes at a time.[230] He testified that he could walk about "20, 30 steps" before he had to hold onto a wall.[231]

Mr. Wright testified that in the morning, if he had an appointment, he would get dressed and had to use a bent hanger to put his socks on and put his pants on because he could not bend down all the way.[232] He said that he microwaved himself breakfast.[233] If he did not have an appointment, he stayed in bed because of his pain.[234] He might "eat something", "attempt to read the Bible," or "watch TV."[235] He did not get a lot of company.[236] He might call his sister or somebody else if he were depressed or angry.[237] He took "a couple naps throughout the day" because he was "up all night using the bathroom or in pain, getting up."[238] He said that he did not sweep, vacuum, do laundry, grocery shop, or use a computer.[239] He used to hike, shoot pool, play dominos, play basketball, and swim.[240] He said that he loved the ocean but had not been for a while because he had no vehicle.[241]

---

[228] AR 33.

[229] AR 34.

[230] *Id.*

[231] *Id.*

[232] AR 35.

[233] *Id.*

[234] *Id.*

[235] *Id.*

[236] AR 36.

[237] *Id.*

[238] *Id.*

[239] *Id.*

[240] *Id.*

[241] AR 37.

He used a cane and testified that a doctor prescribed the cane.[242] He could not initially remember the name of the doctor who prescribed the cane, but then he stated, "it was the doctor before Amy Chan," and he thought that it was "at General Hospital."[243] He said that he used a Paratransit to get around that doctors set up for him.[244]

He testified that he heard voices every day.[245] If he took his medication, he heard them "a little bit." He did not want to be around people when he was on his medication or in pain.[246] On days of appointments, he purposely did not take his medication until after the appointments so that he could attend his appointments.[247] He did not take his medication the day of the hearing and testified that the voices were "talking to me bunches right now."[248] He testified that he would wake up at night "seeing smoke" and that he would then call his case manager or psychiatrist, who would set him up with an extra appointment and "talk him through it."[249]

He testified that he took Seroquel for "the voices and schizophrenia," Norco for pain, Risperdal for depression, "different kinds of muscle relaxers," and other medications for "mood swings," "anger," "depression," "sleeping," "arthritis," "antibiotics," and "back medications."[250] He said that his medication made him feel "pretty zonked out where it renders [him] from doing normal tasks, but it does stop the voices and [he will] be too zonked out to — to be sad."[251] He received physical therapy for his knees and his back but had to cancel because it was "starting to

---

[242] AR 38.

[243] *Id.*

[244] AR 43.

[245] AR 45.

[246] AR 46.

[247] AR 45.

[248] *Id.*

[249] *Id.*

[250] AR 39–40.

[251] AR 40.

hurt too much to do it."[252] He got five steroid injections in his knees but "they didn't work."[253] He was supposed to be getting steroid injections in his back in three weeks.[254] He was "supposed to be getting gastric bypass" surgery and "two knee replacements and back surgery" but his doctors first wanted him to "lose some weight" so he "[wouldn't] be in so much pain."[255]

He testified that he last used cocaine "two and a half, three years ago" and last used alcohol "about a year and a half, two years" ago.[256]

He asked for a release to go back to work but was unable to work because he could not sit for long periods of time, his knees would hurt, and he had to stop the vehicle to stretch.[257]

### 2.4    Vocational Expert ("VE") Testimony

Roxane Minkus, a vocational expert, testified at the hearing on May 29, 2010.[258] She classified Mr. Wright's past work:

> He's worked as a heavy truck driver, [Dictionary of Occupational Titles ("DOT")] 905.663-014. The SVP[259] is 4. It is classified as a medium occupation, however, in one instance, he performed at the sedentary level, which in others, performed at the heavy level. He worked as a light truck driver, the DOT 906.683.022. The SVP is 3. It is a medium occupation, however, it appears he performed at the heavy level. He's worked as a chauffeur, DOT 913.663-010. The SVP is 3. It is a light occupation, however, it appears he performed at the very heavy level. And lastly, he's worked as a companion, DOT 309.677-101. The SVP is 3. It is a light occupation. Based on the record, it appears he may have performed at the very heavy level, but I will have to clarify that. Certainly, the heavy to very heavy level.[260]

---

[252] AR 44.

[253] *Id.*

[254] *Id.*

[255] AR 44–45.

[256] AR 41.

[257] AR 42–43.

[258] AR 46.

[259] Special Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles ("DOT"), App. C, 1991 WL 688702 (4th ed. 1991).

[260] AR 47.

The ALJ posed a hypothetical:

> I'd like you to consider an individual that can lift 20 pounds, can give a — can complete an eight-hour workday if given the option to alternate between sitting and standing, so that's needed in 30-minute increments, and who's limited to simple repetitive tasks because of depressive symptoms. I know the <u>Dictionary of Occupational Titles</u> does not discuss the sit/stand option. Is there something that gives you the expertise to identify [jobs] that permit a sit/stand option?[261]

Ms. Minkus responded to the question regarding the DOT and the sit/stand option:

> Yes, not only my extensive training but my experience working with disabilities for the past 15 years now, over 11 years testifying in Court. My extensive experience and knowledge of the labor market.[262]

The ALJ asked whether such an individual would be able to perform any of Mr. Wright's past work.[263] Ms. Minkus answered no.[264] The ALJ asked if there were other jobs that such an individual could perform.[265] Ms. Minkus responded:

> So, with that hypothetical, the person would be able to work as a bench assembler. It is a light occupation. The DOT also notes that this is called — or called small products assembler or bench assembler. The DOT code is 706.684-022. Again, it is a light occupation, unskilled . . . the person would be able to work as an electrical equipment sub-assembler. It is another light occupation. Also unskilled, SVP 2. The DOT code is 729.684-054 . . . the person would be able to work as cashier II at the sedentary level. This is an occupation that the DOT classifies as light. However, the reality is there are sedentary cashier IIs in the labor market today. Examples are parking lot booths toll booths, ticket counters, and similar situations. The DOT code is 211.462-010, and, again, this is an unskilled occupation.[266]

### 2.5 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Wright was disabled and concluded that he was not.[267]

---

[261] *Id.*

[262] AR 47–48.

[263] AR 48.

[264] *Id.*

[265] *Id.*

[266] AR 48–49.

[267] AR 12–23.

At step one, the ALJ found that that Mr. Wright had not engaged in substantial gainful activity since his alleged onset date of February 24, 2011, and met the insured status requirements through December 31, 2011.[268]

At step two, the ALJ found that Mr. Wright had the following severe impairments: "affective disorder, substance abuse, spinal abnormalities, degenerative changes of the bilateral knees, and obesity."[269]

At step three, the ALJ found that Mr. Wright did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[270] Mr. Wright did not meet listing 1.02 (major dysfunction of a joint) because he did not demonstrate that he was unable to ambulate effectively or unable to perform fine and gross movements effectively.[271] Mr. Wright's degenerative-disc disease did not meet Listing 1.04 (disorders of the spine) because the record did not demonstrate "compromise of a nerve root (including cauda equine) or the spinal cord" with the required additional findings.[272]

As to Mr. Wright's obesity (an issue in dispute), the ALJ stated:

> The claimant's obesity, while not stated by any physician to be disabling, was considered in terms of its possible effects on the claimant's ability to work and perform activities of daily living. . . . I have earlier found claimant's obesity to be severe, but the signs, symptoms and laboratory findings of their obesity are not of such severity as found in any listing. Claimant's limitations due to obesity are reflected in the below residual functional capacity.[273]

With respect to Mr. Wright's mental impairments (another issue in dispute), the ALJ found that individually or combined, his impairments did not meet Listings 12.04 (depressive, bipolar,

---

[268] AR 14.

[269] AR 15–16.

[270] AR 16–17.

[271] AR 16.

[272] *Id.*

[273] AR 17.

and related disorders) or 12.09 (substance-addiction disorders).[274] The ALJ considered whether the paragraph B criteria were satisfied. He concluded:

> In activities of daily living, the claimant has mild restrictions. Claimant is able to microwave meals, read, watch television, talk to others on the phone, and attend doctor's appointments.
>
> In social functioning, the claimant has mild difficulties. Claimant lived with others in a group house. He is able to relate to his health care providers.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. Claimant's depressive and anxiety symptoms would limit him to simple repetitive tasks (Exhibit 16F [Mission Mental Health medical records]).
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Claimant was hospitalized for a week in 2013 due to his mental impairments, and was seen in the emergency room in 2012 after a crack overdose. Neither of these episodes were 2 weeks or longer.[275]

At step four, the ALJ first determined Mr. Wright had the RFC to perform light work with the following limitations: "lift 20 pounds; can complete an eight hours workday, if given the option to alternative between sitting and standing, as needed, in thirty minute increments; and who is limited to simple repetitive tasks."[276] The ALJ found that based on this RFC, Mr. Wright could not perform his past relevant work as a heavy truck driver, light truck driver, chauffeur, or companion.[277]

At step five, the ALJ found that Mr. Wright could work as a "bench assembler," "electrical equipment assembler," and "cashier II."[278] The ALJ held that Mr. Wright was not disabled.[279]

---

[274] *Id.* On September 26, 2015, the SSA published new rules that eliminated the listing 12.09 for substance addiction disorders. 20 CFR Parts 404, 416.

[275] AR 17.

[276] AR 18.

[277] AR 21.

[278] AR 22.

[279] AR 23.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant

is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

Mr. Wright contends that the ALJ erred by:

(1) failing at step two to evaluate the plaintiff's schizophrenia/psychotic and anxiety disorders as severe impairments;

(2) making material factual errors by discrediting Mr. Wright's pain symptoms on the ground that his doctors did not suggest surgery (when in fact his doctors did contemplate surgery), by finding that anxiety was not a medically determinable impairment because no medical source diagnosed Mr. Wright with anxiety (when in fact doctors did discuss his anxiety symptoms), and by stating that the claimant had no episodes of extended decompensation and that his hospitalization in 2013

did not last two weeks or longer (when in fact there was treatment that lasted longer than two weeks);

(3) failing to apply a multiple-factor analysis concerning the effects of obesity on the plaintiff's RFC;

(4) not providing specific, clear, and convincing reasons to support his finding that the plaintiff's daily activities were inconsistent with more than mild restrictions in daily living and social functioning;

(5) improperly weighing medical opinions by failing to properly weight Dr. Warbritton's opinion, rejecting the GAF scores provided by Dr. Bender, Dr. Fromont, Dr. Ross, and Jessica Martinez, and assigning little weight to the opinion of chiropractor Crawford.

(6) failing to address Mr. Wright's need for a cane, his psychotic hallucinations, and his limited capacity for social interaction in his RFC;

(7) failing to resolve major discrepancies between the VE testimony and DOT; and

(8) failing to include a limitation of being off-task fifteen percent of the day, which would preclude employment.

### 1. Whether the ALJ Erred at Step Two by Failing to Evaluate Mr. Wright's Schizophrenia/Psychotic and Anxiety Disorders

Mr. Wright argues that the ALJ erred by not evaluating the severity of his schizophrenia/psychotic disorder and anxiety disorder at step two of the sequential-evaluation process.[280] Mr. Wright argues that "[b]ecause the ALJ excluded psychotic and anxiety symptoms from consideration in his assessment of Plaintiff's RFC and instead characterized his diagnoses as an affective disorder and substance abuse exclusively, the residual functional capacity determination was incomplete, flawed, and not supported by substantial evidence in the record."[281]

At step two of the five-step sequential inquiry, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ must consider the record as a whole, including evidence that both supports and detracts from its final decision. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). An impairment is not severe if it does not significantly limit the claimant's mental or physical

---

[280] Mot. – ECF No. 28 at 1–2.

[281] *Id.* at 2.

abilities to do basic work activities. 20 C.F.R. § 404.1521(a).[282] Basic work activities are "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b). To determine the severity of a mental impairment specifically, the ALJ must consider four broad functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. § 404.1520a.

The burden at Step Two is relatively light. In particular, the Ninth Circuit has held that "the step two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153–54 (1987)). Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id*. (internal quotation marks omitted) (citing SSR 85–28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988)).

As to the first issue of Mr. Wright's schizophrenia/psychotic disorder, the Ninth Circuit's decision in *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012), is instructive. In *Hill*, the ALJ concluded at step two that the claimant had severe mental impairments that included bipolar disorder, mixed personality disorder, anxiety, and borderline intellectual functioning. *Id*. The claimant also was diagnosed with panic disorder and testified at the ALJ hearing that he had symptoms of panic attacks. *Id.* The ALJ excluded panic disorder from the claimant's list of impairments and characterized her diagnosis as anxiety alone. *Id.* The Ninth Circuit concluded that because the ALJ excluded panic disorder, "the residual functional capacity determination was incomplete, flawed, and not supported by substantial evidence in the record." *Id.*

Similarly, here the ALJ identified Mr. Wright's mental impairment only under the term "affective disorder."[283] In reaching that conclusion, the ALJ cited to the following medical

---

[282] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, May 29, 2015.

[283] AR 15.

records: treating psychiatrist Dr. Katz's diagnosis of "schizoaffective disorder;"[284] treating physician Dr. Bender's diagnosis of "mood disorder [not otherwise specified]"; and treating physician Dr. Peter-Frank diagnosis of "major depressive disorder with psychotic features."[285] The medical record, however, includes additional diagnoses that refer specifically to schizophrenia and psychosis. These include treating physician Dr. Summerville's diagnosis of "schizophrenia,"[286] treating physician Dr. Sinha's diagnosis of "Depression/schizophrenia,"[287] and treating physician Dr. Ross's diagnosis of "Psychosis NOS."[288] The ALJ did recognize that the medical records documented Mr. Wright's schizophrenia symptoms, noting that Mr. Wright reported "hearing voices" and had "a long history of . . . auditory hallucinations."[289] Despite acknowledging these symptoms, ALJ did not explain why he labeled Mr. Wright's mental impairment a severe "affective disorder" but not schizophrenia or a psychotic disorder.

Nonetheless, the Commissioner argues that the ALJ acknowledged that Mr. Wright received multiple diagnoses for his symptoms related to schizophrenia and used the broader-level diagnosis of affective disorder at step two.[290] The ALJ's step-three analysis, however, demonstrates that the ALJ did not treat "affective disorder" as a broader-level disorder that included schizophrenia. At step three, the ALJ considered only whether Mr. Wright's impairments met the criteria listings of 12.04 ("Depressive, Bipolar and Related Disorders") and 12.09 ("Substance Addiction

---

[284] AR 851.

[285] AR 15–16.

[286] AR 960. Mr. Wright submitted Dr. Summerville's treatment notes — as well as other updated medical records from UCSF — to the Appeals Council (Exhibits 18F–20F, AR 983–1072). Although this evidence was not before the ALJ, the Ninth Circuit has held "that when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r Soc. Sec. Admin.* 682 F.3d 1157, 1159-60 (9th Cir. 2012) (adopting *Ramirez v. Shalala*, 8 F.3d 1449, 1451-52 (9th Cir. 1993)).

[287] AR 1043.

[288] AR 632.

[289] AR 15–16.

[290] Opp. – ECF No. 29 at 10.

Disorders"). The ALJ did not consider whether Mr. Wright's impairments met the criteria listings of 12.03 ("Schizophrenia Spectrum and Other Psychotic Disorders")[291] In addition, in his analysis of Mr. Wright's limitations, the ALJ's only discussion of Mr. Wright's mental impairments was that Mr. Wright's "depressive and anxiety symptoms would limit him to simple repetitive tasks."[292] Despite Mr. Wright's testimony that he hears voices "every day"[293] and his treating medical providers' accounts of his auditory hallucinations,[294] the ALJ did not explain how his analysis accounted for Mr. Wright's schizophrenia or psychotic symptoms.

Given these circumstances, the ALJ improperly limited Mr. Wright's list of impairments, which resulted in an incomplete analysis in the sequential analysis. *See Hill*, 698 F.3d at 1161. Because the ALJ excluded schizoaffective disorder and/or psychosis from Mr. Wright's list of impairments and instead characterized his diagnosis as an "affective disorder" alone, the residual-functional-capacity determination was incomplete, flawed, and not supported by substantial evidence in the record. *See id.* The court declines to find this error harmless. *See Molina*, 674 F.3d at 1111.

As to the issue of anxiety, Mr. Wright argues that the ALJ failed to consider anxiety as a severe impairment at step two and also makes the similar argument that the ALJ made the fact error of finding that Mr. Wright "alleges anxiety" and that "[n]o acceptable medical source has diagnosed [Mr. Wright] with anxiety."[295]

The ALJ's finding that Mr. Wright was not diagnosed with anxiety failed to account for the following significant evidence in the record: (1) San Francisco General Hospital Nurse Morrow's August 3, 2013 assessment that noted anxiety symptoms of "excessive uncontrolled worry, [a]pprehension, restlessness, sleep disturbance, [and] [i]nterpersonal anxiety;"[296] (2) UCSF

---

[291] AR 17.

[292] *Id.*

[293] AR 45.

[294] AR 524, 599, 632, 844, 1021, 1142.

[295] Mot. – ECF No. 28 at 1–3.

[296] AR 623.

primary-care physician Dr. Chen's January 5, 2015 progress notes that listed anxiety as an active problem and noted that "Psychiatrist is prescribing psych meds, advised to follow up with him and pt amenable to doing this;"[297] (3) UCSF Bariatric Surgery Center Dr. Posselt's April 15, 2015 progress notes that listed an anxiety diagnosis in Mr. Wright's past medical history;[298] and (4) UCSF Dr. Singh's April 6, 2015 progress notes that listed an anxiety diagnosis in Mr. Wright's past medical history during his consultation for obesity.[299]

On remand, the ALJ must reconsider the indicia of clinical anxiety from the medical record, including at step two in the analysis. The court notes that the UCSF medical records from January 2015 to March 2016 were submitted to the appeals counsel. *See* AR 895–1072. The ALJ can review these records as part of its reconsideration of Mr. Wright's anxiety.[300] The ALJ also can reconsider the finding that no acceptable medical source diagnosed Mr. Wright with anxiety in light of the medical records.

### 2. Whether the ALJ Made Material Fact Errors

Mr. Wright argues that the ALJ made material factual errors by (1) discrediting Mr. Wright's pain symptoms on the grounds that his "doctors have not suggested surgical treatment," (2) finding that anxiety was not a medically determinable impairment on the grounds that no medical source diagnosed Mr. Wright with anxiety, and (3) incorrectly stating that the claimant had no episodes of extended decompensation and that his hospitalization in 2013 did not last two weeks or longer.

First, Mr. Wright's treating physicians did contemplate surgical treatments for Mr. Wright's knee and back pain.[301] Mr. Wright's treating physician at UCSF, Dr. Chen, referred Mr. Wright to

---

[297] AR 912.

[298] AR 942.

[299] AR 937.

[300] *See* supra n.285.

[301] AR 717–18, 824.

orthopedic surgery, discussed surgical treatment options for knee and back pain with Mr. Wright, and noted that Mr. Wright would get knee replacement surgery if his knee pain did not improve.[302] Additionally, Mr. Wright testified that he is "supposed to be getting . . . two knee replacements and back surgery" but his doctors first wanted him to "lose some weight" so he "won't be in so much pain."[303] On remand, the ALJ must consider the evidence that Mr. Wright's treating physician considered surgical-treatment options for his back and knee pain.

Second, as the court discussed above in its analysis of the ALJ's findings at step two, the record contains significant and probative evidence regarding Mr. Wright's anxiety symptoms, which the ALJ can consider on remand.

Third, section 12.00 of the Social Security regulations defines "repeated episodes of decompensation, each of extended duration" as three episodes within one year, or an average of once every four months, each lasting at least two weeks. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(C)(4). Mr. Wright was hospitalized at San Francisco General Hospital first on November 5, 2012, and then again from August 2, 2013 to August 9, 2013 (7 days).[304] After his second stay at San Francisco General Hospital, he was transferred to a residential-treatment program at La Posada Crisis Residential Program from August 9, 2013 to August 27, 2013 (18 days).[305] Mr. Wright is correct that the ALJ failed to consider his time at La Posada as potentially an episode of decompensation that lasted more than two weeks.[306] The ALJ can consider the hospitalizations in his overall analysis on remand.

---

[302] *Id.*

[303] AR 44–45.

[304] AR 524, 671.

[305] AR 599–614.

[306] Any analysis of the interplay between hospitalization and residential treatment is for the ALJ in the first instance.

### 3. Whether the ALJ Failed to Apply a Multiple-Factor Analysis Concerning the Effects of Obesity on Mr. Wright's RFC

Mr. Wright contends that the ALJ did not properly consider the limitations caused by his obesity.[307] "While obesity is no longer listed among the Listing of Impairments, it is still classified as a medically determinable impairment that must be considered in disability assessments." *Browning v. Colvin*, 228 F. Supp. 3d 932, 942 (N.D. Cal. 2017) (citing SSR 02–1p, 2002 WL 34686281). "In evaluating obesity to determine a claimant's RFC, the ALJ's assessment 'must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005)). "As with other impairments, the ALJ should explain how he determined whether obesity caused any physical or mental impairments." *Id.* (citing SSR 02–1p).

Furthermore, SSR 96–8p provides:

> In assessing RFC, the adjudicator must consider only limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

*Id.* (quoting SSR 96–8p).

Here, the ALJ found obesity to be a severe impairment[308] and stated that he considered both Mr. Wright's obesity in combination with his other impairments and its impact on his ability to work.[309] The ALJ, however, failed to consider and adequately explain how obesity exacerbated Mr. Wright's other impairments, including his knee pain, spinal abnormalities, depression, and anxiety. *See Celaya v. Halter*, 332 F.3d 1177, 1182–83 (9th Cir. 2003); *see also Marica v. Sullivan*, 900 F.2d 172, 176 ("[T]he ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments.").

---

[307] Mot. – ECF No. 28 at 4.

[308] AR 15.

[309] AR 17.

In *Celaya*, the ALJ excluded the claimant's obesity from his analysis, and the Ninth Circuit remanded and directed the ALJ to complete a step-three analysis "that explicitly accounts for the direct and marginal effects of the [claimant's] obesity during the period in question and that culminates in reviewable, on-the-record findings." 332 F.3d at 1183. The court observed that "it was clear from the record that [the claimant's] obesity was at least close to the listing criterion, and was a condition that could exacerbate her reported illness," which included diabetes and hypertension. *Id.* at 1182. Thus, the ALJ "was responsible for determining the effect of [the claimant's] obesity upon her other impairments, and its effect on her ability to work and general health, given the presence of those impairments." *Id.*

On the one hand, the case here is similar to *Celaya* because Mr. Wright's obesity was a condition that could exacerbate his degenerative knee problems, depression, and anxiety. Indeed, treating physician Amy Chen, M.D. at UCSF noted that Mr. Wright's severe knee pain was likely exacerbated by his weight.[310] Andrew Posselt, M.D. (at UCSF Bariatric Surgery Center) diagnosed Mr. Wright with "morbid obesity and obesity-related comorbidities," including diabetes, osteoarthritis (painful joints), and depression.[311] His medical records document treating-physician diagnoses of morbid obesity from 2011 to 2016.[312] The medical records also show that he stood at 6' 1.5" tall, between February 25, 2011 and March 2016 his weight ranged from 327 to 365 pounds, and his BMI ranged from 45.06 to 46.59.[313]

On the other hand, the case here is different from *Celaya* because Mr. Wright was represented by counsel and the ALJ did not wholly ignore obesity. Here the ALJ found obesity to be a severe impairment, stated that he considered Mr. Wright's obesity in combination with other severe impairments, and stated that the "signs, symptoms and laboratory findings of [Mr. Wright's] obesity are not of such severity as found in any listing."[314] But the ALJ did not explain *how* he

---

[310] AR 718.

[311] AR 585, 937, 941–42.

[312] *See, e.g.*, AR 419, 529, 941.

[313] *See, e.g.*, AR 438, 442, 585, 937, 941–42, 1055.

[314] AR 15, 17.

analyzed Mr. Wright's obesity in combination with his other impairments, and he did not identify *which* signs, symptoms, and lab findings he relied on. Given that the record indicates that Mr. Wright's obesity exacerbated his other impairments, the ALJ's analysis is not sufficient. *Celaya*, 332 F.3d at 1182; *Marica*, 900 F.2d at 176; *cf. Burch*, 400 F.3d at 682 (distinguishing *Celaya* and concluding that the ALJ properly analyzed obesity when the record did not indicate that obesity exacerbated other impairments).

On remand, the ALJ can consider these medical issues related to obesity and can address the combined effect of Mr. Wright's obesity on his related impairments, including his knee pain, depression, and anxiety.

### 4. Whether the ALJ Erred by Assigning Mr. Wright Mild Restrictions in Activities of Daily Living and Social Functioning

Mr. Wright argues that the ALJ erred by finding that Mr. Wright had only "mild" restrictions in activities of daily living and social functioning.[315] On this issue, Mr. Wright contends that the ALJ improperly concluded that Mr. Wright's testimony about the severity of his symptoms was "not entirely credible."[316] Mr. Wright contends that the ALJ's conclusion about his credibility was improper because it was based on (1) Mr. Wright's ability "to microwave meals, read, watch television, talk to others on the phone, and attend doctor's appointments,"[317] and (2) the fact that Mr. Wright "lived with others in a group house" and "is able to relate to his health care providers."[318] The Commissioner responds that the ALJ did not rely solely on Mr. Wright's report of daily activities in his credibility analysis and instead concluded that Mr. Wright was "not entirely credible" because:

---

[315] Mot. – ECF No. 28 at 4.

[316] *Id.*

[317] AR 17.

[318] *Id.*

United States District Court
Northern District of California

> (i) treatment was effective and reduced his auditory hallucinations, (ii) he received conservative treatment, (iii) Plaintiff's daily activities, including working at the Salvation Army, were inconsistent with disability, (iv) he attempted to return to work, (v) he failed to follow prescribed treatment, and (vi) he made inconsistent statements regarding his symptoms and drug use (AR 119–20).[319]

The next sections address the law governing credibility assessments and then each factor that the Commissioner raises.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks omitted). "The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

Here, at the first step, the ALJ found that Mr. Wright presented objective medical evidence that his underlying impairments could reasonably be expected to produce the pain and other

---

[319] Cross-Mot. – ECF No. 29 at 13.

symptoms alleged.[320] At the second step, the ALJ found that Mr. Wright's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible."[321] The Commissioner argues that this conclusion is proper because it relied on the six factors quoted above.

On the first point regarding effective treatment, the ALJ found that "the claimant has improved with medication, and is less depressed and hears voices less often."[322] In so finding, the ALJ relied on Dr. Katz's progress notes from (1) January 17, 2014 noting that Mr. Wright "states he has been feeling a little better, a little less depressed" but that he "continues to hear voices,"[323] (2) April 7, 2014 noting that he "has felt a bit less depressed, and that he has been hearing voices less often,"[324] and (3) January 1, 2015 noting that Mr. Wright reported he "was having some anxiety" and "having less depression and less psychosis."[325] The ALJ did not address Dr. Katz's progress notes from February 19, 2015 that stated that Mr. Wright reported "feeling very anxious due to [auditory hallucinations] and having difficulty sleeping at night." Dr. Katz called Mr. Wright on February 23, 2015 to check in after he had missed appointments and Mr. Wright stated that "he still has [auditory hallucinations]."[326]

On the second point of conservative treatment, as discussed above, the ALJ incorrectly concluded that Mr. Wright had not considered surgical treatment for his physical impairments. Mr. Wright's treating physicians did contemplate surgical treatments for Mr. Wright's knee and back

---

[320] AR 19.

[321] *Id.*

[322] *Id.*

[323] AR 856.

[324] AR 859.

[325] AR 879.

[326] AR 884.

pain.[327] Mr. Wright also received steroid injections for knee and back pain, which he reported to be ineffective at managing pain for more than few days.[328]

On the third point regarding daily activities and social functioning (the main point that Mr. Wright focuses on), the ALJ noted that Mr. Wright is able "to microwave meals, read, watch television, talk to others on the phone, and attend doctor's appointments," and that Mr. Wright "lived with others in a group house" and "is able to relate to his health care providers."[329] While a claimant's daily activities may provide a specific and legitimate basis for a finding of inconsistency with her disabling conditions, *see Molina*, 674 F.3d at 1113 and *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991), the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain" and thus are inconsistent with eligibility for disability benefits. *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). In *Garrison*, the Ninth Circuit recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations, concluding that "only if [the] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on her credibility." *Id.* (alterations in original) (internal quotations omitted); *see also Orn*, 495 F.3d at 639 (watching television is an activity that is "so undemanding that [it] cannot be said to bear a meaningful relationship to the activities of the workplace"); *Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *Fair*, 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.").

---

[327] AR 717–18, 824.

[328] AR 807, 808, 812, 823–27, 903, 1050.

[329] AR 17.

On the fourth point of Mr. Wright's attempt to return to work, the ALJ discredited Mr. Wright's testimony because he "has made several statements indicating a desire (and therefore the perceived ability) to return to work."[330] The ALJ cites Mr. Wright's request for a release to return to work from Dr. Warbritton (the workers-compensation examining doctor)[331] and his statement to nurse Cia Byrnes (at Ritter Health Center) that he wanted to "begin a program to become a phlebotomist."[332] But "[i]t is disingenuous to argue that the desire to return to work can be held against a claimant. . . . [D]esire to work does not equal ability to work." *Littlejohn v. Colvin*, No. 16-CV-3380 (BMC), 2017 WL 1049505, at *3 (E.D. N.Y. Mar. 18, 2017); *see also Blakesley v. Colvin*, No. C14-137-JLR, 2014 WL 4804507, at *5 (W.D. Wash. Sept. 26, 2014) (a claimant's desire to work is not a legitimate reason to discount her opinion). Moreover, Dr. Warbritton's notes stated that Mr. Wright "strongly desires *to attempt* to return to his usual and customary job duties," and did not address whether Mr. Wright believed he was *able* to work.[333] While arguably allowing Mr. Wright to attempt to return to work implies that Dr. Warbritton believed Mr. Wright was capable of working, several times, Mr. Wright acknowledged that he was unable to work (adding that his inability to work made him feel depressed).[334]

On the fifth point regarding Mr. Wright's failure to follow prescribed treatment, the ALJ found that Mr. Wright had "missed several mental health appointments."[335] The ALJ did not address whether Mr. Wright missed several mental-health appointments because his impairments were not severe or because of other circumstances. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996); *Regennitter v. Comm'r of Social Sec. Admin*, 166 F.3d 1294, 1297–98 (9th Cir. 1999). The ALJ cites Mr. Wright's missed appointments with his psychiatrist, Dr. Katz. But Mr. Wright told clinical social worker Jennifer Landivar that he did "not trust" Dr. Katz and did not want to

---

[330] AR 20.

[331] AR 20, 425.

[332] AR 20, 578.

[333] AR 425 (emphasis added).

[334] AR 532–33, 960.

[335] AR 20.

continue to see him.[336] In addition, Mr. Wright's mental-health impairments, his inability to pay, and his homelessness and unstable housing situation are documented in the record.[337] The ALJ did not address whether these circumstances, rather than a lack of severe impairments, precluded Mr. Wright from keeping appointments. Absent a more explicit analysis, the court cannot assess whether the ALJ's reliance on this factor to discredit the reported severity of his impairments is legitimate and supported by clear and convincing evidence. *See Molina*, 674 F.3d at 1112.

On the sixth point of inconsistent statements, the ALJ pointed to the discrepancy between (1) Mr. Wright's statement on November 5, 2012 at San Francisco General Hospital Psychiatric Emergency Department that he overdosed on alcohol, marijuana, and crack cocaine because he was depressed and angry,[338] and (2) his statement on December 13, 2012 during a mental-health appointment with Dr. Chan at Sunset Mental Health Center that he used those substances while celebrating a Giants win "and denied any suicide attempts."[339] While inconsistencies in a claimant's prior statements may be a legitimate basis for discrediting a claimant's testimony, *see Orn*, 495 F.3d at 636, on this record, and considering the ALJ's articulated reasons, the court cannot assess whether, on balance, the inconsistency identified by the ALJ justifies discrediting Mr. Wright's testimony. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006) (concluding that ALJ's adverse credibility finding based on a claimant's single inconsistent statement about his alcohol dependence and abuse was unjustified).

In sum, given the errors identified above, the ALJ did not provide "specific, clear and convincing reasons for" rejecting Mr. Wright's testimony regarding the severity of his symptoms. *See Molina*, 674 F.3d at 1112. On remand, the ALJ can reassess Mr. Wright's credibility.

---

[336] AR 1148, 1151.

[337] AR 543–552.

[338] AR 20; AR 524.

[339] AR 20; AR 539.

### 5. Whether the ALJ Properly Weighed Medical Opinions

Mr. Wright contends that the ALJ erred with respect to weighing the medical-opinion evidence by:

> (1) rejecting the GAF scores[340] of Eric Bender, M.D. (San Francisco General Hospital Psychiatric Emergency Services), Sebastien Fromont, M.D. (San Francisco General Hospital Psychiatric Emergency Services), Jessica Ross, M.D. (San Francisco General Hospital Psychiatric Emergency Services), and Jessica Martinez (occupation and degree not specified) (La Posada Residential Treatment Program);

> (2) rejecting the opinion of John D. Warbritton, M.D. (an orthopedic surgeon) on the grounds that he is a workers-compensation doctor;

> (3) ignoring the opinions of Brian Crawford, D.C. (a chiropractor) and Jessica Martinez (occupation undefined in the record) on the ground that they were not acceptable medical sources; and

> (4) giving little weight to the GAF score given by Raul Reyes, R.N. (Sunset Mental Health) and ignored his treatment notes.[341]

The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison*, 759 F.3d at 1010 (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn*, 495 F.3d at 630 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

Section 404.1513(a) of Title 20 C.F.R. requires evidence "from accepted medical sources to establish whether you have a medically determinable impairment." "Accepted medical sources"

---

[340] As noted above, a Global Assessment of Functioning ("GAF") score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison*, 759 F.3d at 1002 n.4 ("[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'").

[341] Mot. – ECF No. 28 at 6.

include licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id*.

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen*, 80 F.3d at 1285.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick*, 157 F.3d at, 725 (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted).

The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). "Other sources" include nurse practitioners, physicians' assistants, therapists, teachers, social workers, spouses and other non-medical sources. 20 C.F.R. § 404.1513(d). The ALJ is required to consider observations by "other sources" as to how an impairment affects a claimant's ability to work, *id.*; nontheless, an "ALJ may discount the testimony" or an opinion "from these other sources if the ALJ gives . . . germane [reasons] . . . for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted).

### 5.1 Eric Bender, M.D., Sebastien Fromont, M.D., and Jessica Ross, M.D.

Eric Bender, M.D., Sebastien Fromont, M.D., and Jessica Ross, M.D. are treating physicians at San Francisco General Hospital Psychiatric Emergency Services.[342] Dr. Bender and Dr. Fromont

---

[342] AR 528–29, 662.

both assigned Mr. Wright a GAF of 38.[343] Dr. Ross assigned Mr. Wright a GAF of 30.[344] The ALJ

gave "little weight" to the GAF scores they assigned because

> a GAF score, as its name indicates, is a global assessment, and paints a rather broad picture, not definitive with respect to particular aspects of workplace functioning. These scores are highly subjective ratings that can easily vary from one practitioner to the next and generally represent only a "snapshot" of the presentation of information available from a subject on the day of assessment.[345]

Dr. Bender, Dr. Fromont, and Dr. Ross arguably are treating medical doctors with contradicted

opinions because each physician assigned a different GAF score. Assuming the their opinions are

contradicted, the ALJ had to provide "specific and legitimate reasons supported by substantial

evidence in the record" for assigning little weight to their opinions, rather than the more-

deferential standard for uncontradicted opinions. *See Reddick*, 157 F.3d at 725. Even under the

less-deferential standard for contradicted opinions, the ALJ failed to give adequate reasons for

discounting their opinions.

The ALJ's only reason for discrediting the GAF scores of Dr. Bender, Dr. Fromont, and Dr.

Ross was that GAF scores generally are highly subjective and not definitive. The Ninth Circuit has

observed that "GAF scores, standing alone, do not control determinations of whether a person's

mental impairments rise to the level of a disability (or interact with physical impairments to create

a disability);" nonetheless, "they may be a useful measurement." *Garrison*, 769 F.3d at 1003 n.4.

Given the *Garrison* court's holding regarding the potential usefulness of GAF scores, the ALJ

cannot wholly reject the GAF scores assigned by Dr. Bender, Dr. Fromont, and Dr. Ross —

acceptable treating medical sources — merely on the basis that they are GAF scores. Moreover,

the ALJ did not discuss other portions of their opinions or address whether he adopted or rejected

them. In sum, the ALJ did not provide sufficient reasons for discounting these treating physicians'

opinions.

---

[343] AR 528–29.

[344] AR 672.

[345] AR 20–21.

### 5.2 Jessica Martinez

Jessica Martinez completed a clinical assessment at La Posada Crisis Residential Treatment Program. Her occupation and degree are not readily apparent from the medical record. She completed a clinical assessment on August 9, 2013.[346] She assigned Mr. Wright a GAF of 35.[347] The ALJ gave two reasons for assigning "little weight" to the GAF score she assigned. The first reason mirrored the ALJ's rejection of the San Francisco General Hospital doctors' GAF scores: the GAF score was "not definitive with respect to particular aspects of workplace functioning" and was "highly subjective." The second reason was that "[t]here is no information given about whether Jessica Martinez is an acceptable medical source."[348] On this record, the court concludes that Ms. Martinez is an "other opinion" non-medical source. *See* 20 C.F.R. § 404.1502(a) (listing types of acceptable medical sources). As a non-medical source, the ALJ was required to give germane reasons for rejecting Ms. Martinez's opinion. *See Molina*, 674 F.3d at 1111.

The ALJ's first reason for assigning little weight to her opinion is that GAF score is not useful. Again, for the reasons stated above, this alone is not a germane reason because the Ninth Circuit has held that GAF scores may be useful when considered in combination with other medical evidence. *See Garrison*, 769 F.3d at 1003 n.4. The ALJ's second reason for discrediting her opinion — that the record does not indicate whether she is an acceptable medical source — is not sufficient either. Assuming that Ms. Martinez was a non-medical source, the ALJ had to consider her observations and give germane reasons for discounting her opinions. 20 C.F.R. § 404.1513(d); *see also Molina*, 674 F.3d at 1111. He did not.

### 5.3 John D. Warbritton, M.D.

John Warbritton, M.D. is an examining orthopedist. He opined that Mr. Wright's spine impairment is "a fifteen to eighteen percent impairment of the whole person."[349] He also opined

---

[346] AR 601–604. The ALJ incorrectly reported that Ms. Martinez assigned the GAF score on March 4, 2013. AR 21. Ms. Martinez assigned the GAF score in her assessment on August 9, 2013. AR 603–04.

[347] AR 603.

[348] AR 21.

[349] AR 422.

that Mr. Wright "experiences a <u>substantial</u> compromise with regard to his ability to perform a wide range of activities of daily living or work activities, as confirmed based upon the completion of a two page 'Questions Concerning Activities of Daily Living' form in my office."[350] The ALJ assigned "little weight" to his opinions because he "phrases his opinion on the claimant's limitations in workers compensation language, and does not specify what functions claimant can or cannot do."[351] As a controverted opinion of an examining physician, the ALJ had to provide "specific and legitimate reasons supported by substantial evidence in the record" for assigning little weight to Dr. Warbritton's opinion. *See Reddick*, 157 F.3d at 725.

Here, the ALJ's first reason for rejecting Dr. Warbritton's opinions — that they did not state Mr. Wright's functional limitations[352] — is factually inaccurate. And regardless of whether his assessment included functional limitations, the ALJ must assess the evidence and provide specific and legitimate reasons for rejecting it. *Id.*

The ALJ's second reason for assigning little weight to Dr. Warbritton's opinions — that his assessment is phrased in workers-compensation language — is not specific and legitimate. "[T]he ALJ may not disregard a physician's medical opinion simply because it was initially elicited in a state workers-compensation proceeding, or because it is couched in the terminology used in such proceedings." *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002) (collecting cases); *see also Gonzales v. Colvin*, No. CV 15-00272-RAO, 2015 WL 6673685, at *3 (C.D. Cal. Oct. 30, 2015) (holding that the ALJ's decision to reject evidence — on the ground that it was elicited in the context of workers compensation — was not specific or legitimate). Moreover, the ALJ may translate terms of art contained in such medical opinions into the corresponding Social Security terminology in order to accurately assess the implications of those opinions. *Id.*; *see also Marci v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (holding that an ALJ analyzing medical opinions using workers-compensation terminology can "draw inferences" logically flowing from the evidence).

---

[350] *Id.* (emphasis in original).

[351] AR 20.

[352] AR 422.

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Warbritton's opinion. *See Booth*, 181 F. Supp. 2d at 1105.

### 5.4 Brian Crawford, D.C.

Brian Crawford is a treating chiropractor.[353] He opined that Mr. Wright could not do the following: lift/push/pull/carry more than 10 pounds at any time; engage in prolonged bending or stooping; engage in prolonged or repetitive climbing, kneeling, or squatting; climb ladders or work at heights; and sit more than 2 hours/minute without getting up.[354] The ALJ gave little weight to the opinion of Dr. Crawford because he "is not an acceptable medical source," his "'back pain disability index' gives no information on claimant's functional limitations," and his "disability slips reflection only short-term, time-limited restrictions."[355] As a chiropractor, Mr. Crawford is "other source" evidence. 20 C.F.R. § 404.1513(d). The ALJ had to give germane reasons for rejecting Mr. Crawford's opinion. *See Molina*, 674 F.3d at 1111.

As the court discussed in the preceding section, these reasons — Mr. Crawford is not an acceptable medical source and the extent of his assessment of Mr. Wright's functional limitations — are not, without more, legitimate reasons for rejecting Mr. Crawford's opinions. 20 C.F.R. § 404.1513(d); *see Molina*, 674 F.3d at 1111. The additional reason the ALJ cites for rejecting Mr. Crawford's opinion — that he assigned only short-term and time-limited restrictions — may or may not be sufficient. On remand, the ALJ must consider the issue in his overall assessment of the medical-opinion evidence.

### 5.5 Raul Reyes, R.N.

Raul Reyes is a treating registered nurse that Mr. Wright saw at Sunset Mental Health Center.[356] Nurse Reyes assigned Mr. Wright a GAF score of 55.[357] The ALJ assigned "little

---

[353] AR 377.

[354] AR 391.

[355] AR 20.

[356] AR 546–552.

[357] AR 887.

weight" to the GAF score because "there is no information given about whether [R]aul Reyes[358] examined or treated Mr. Wright, or whether he is an acceptable medical source."[359] As a R.N., Nurse Reyes is "other source" evidence. 20 C.F.R. § 404.1513(d). The ALJ had to give germane reasons for rejecting Nurse Reyes's opinion. *See Molina*, 674 F.3d at 1111. The ALJ's articulated reasons for rejecting Nurse Reyes's opinions are insufficient. The ALJ stated that there is no evidence about whether he is an acceptable medical source but the medical records identify Nurse Reyes as a registered nurse, and thus he is an "other source."[360] 20 C.F.R. § 404.1513(d). That requires the assessment described above. The ALJ also stated that there is no evidence about whether Nurse Reyes examined or treated Mr. Wright, but the medical records show that he examined Mr. Wright in person several times from November 11, 2012 to December 14, 2012.[361] Under the applicable legal standard, the ALJ did not articulate germane reasons for rejecting Nurse Reyes's opinion. The court thus remands this issue to the ALJ.

## 6. Whether the ALJ Erred in Determining Mr. Wright's RFC

The ALJ determined Mr. Wright had the RFC to perform light work with the following limitations: "lift 20 pounds; can complete an eight hours workday, if given the option to alternative between sitting and standing, as needed, in thirty minute increments; and who is limited to simple repetitive tasks."[362] Mr. Wright argues that ALJ erred in his RFC analysis because he excluded from his RFC determination the need for a cane, the impact of auditory hallucinations, and the limitation to superficial interactions with the public.[363] Mr. Wright makes the related argument that the ALJ committed multiple legal errors, which caused the ALJ to

---

[358] The ALJ refers to Nurse Raul Reyes as "Paul Reyes." AR 20.

[359] AR 20.

[360] AR 542.

[361] AR 546–552.

[362] AR 18.

[363] Mot. – ECF No. 28 at 6.

overlook material functional limitations and render a flawed RFC.[364] Mr. Wright raises these as separate issues.[365] Given the similarity of the issues, the court addresses them together here.

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r of Social Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015); see also *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("it is the responsibility of the ALJ, not [a] physician, to determine residual functional capacity [RFC]"). The ALJ's determination of a claimant's RFC must be based on the medical opinions and the totality of the record. 20 C.F.R. §§ 404.1527(d), 404.1546(c). Moreover, the ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison*, 759 F.3d at 1010 (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn*, 495 F.3d at 630 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

The RFC assessment is built on the ALJ's assessment at the prior steps in the sequential evaluation process and his weighing of the medical evidence. Because the court remands based on the analysis in the prior steps, the court remands here too. On remand, the ALJ can reconsider the RFC assessment at step five after it considers its analysis in the earlier steps.

### 7. Whether the ALJ Erred by Failing to Identify and Resolve Discrepancies Between VE Testimony and the ALJ's RFC Assessment

Mr. Wright contends that the ALJ erred at step five because he failed to identify and resolve inconsistencies between the job descriptions for the DOT jobs that the VE identified and the ALJ's RFC.[366] The VE testified that Mr. Wright could perform the following jobs: bench assembler,

---

[364] *Id.* at 7.

[365] *Id.* at 6–7.

[366] Mot. – ECF No. 28 at 7.

DOT 706.684-022; electrical equipment sub-assembler, DOT 729.684-054; and cashier II, DOT 211.462-010.[367] Mr. Wright argues that the DOT job descriptions for the jobs are inconsistent with his need to use a cane and his need to alternate between sitting and standing.[368]

The issue of the VE testimony is predicated on the ALJ's RFC assessment. The court has held that the ALJ erred in evaluating Mr. Wright's mental impairments, his use of a cane, and his weighing of the medical evidence. On remand, the ALJ's assessment at step five will rest on his reconsideration of the issues. This may change the RFC assessment and the formulation of the hypotheticals posed to the VE, and the VE's resulting responses regarding DOT jobs. The court remands on this issue.

### 8. Whether the ALJ Should Have Limited Mr. Wright to Being Off-Task Fifteen Percent of the Day and Found That His Limitations Preclude Employment

Mr. Wright's final argument is that the ALJ should have found that his limitations — specifically, his need to alternate between sitting and standing, his use of a cane, and his auditory hallucinations — required him to be off-task fifteen percent of the day, and that such a limitation precluded him from employment.[369]

As the court discussed in the preceding sections, the hypotheticals posed to the VE and the VE's assessments (including her responses) are predicated on the ALJ's weighing and evaluation of the medical records. Because the court remands on those issues, the court remands on this issue too. The ALJ's evaluation of Mr. Wright's mental impairments, use of a cane, and the medical evidence affect the formulation of the hypotheticals to the VE and her responses.

---

[367] AR 48–49.

[368] Mot. – ECF No. 28 at 7.

[369] *Id.* at 9.

**CONCLUSION**

The court grants Mr. Wright's summary-judgment motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: June 25, 2018

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California